J. H. Phipps Lumber Company *v*. Phipps.

Opinion delivered March 12, 1928.

1. Corporations—Power to Lease or Sell Land.—A corporation which was authorized to buy timber lands had the inherent power to lease of sell such lands, although no such provision was contained in its charter.

2. Corporations—Authority of President to Make Contracts.— In an action against a corporation for breach of a contract for lease and option of certain lands, the question whether the president of the corporation, who owned the majority of the stock and dominated the corporation, acted as agent for it in making the contract of lease and option, *held* for the jury.

3. Corporations—Evidence as to Contract.—In an action against a corporation for breach of a contract for lease and option of lands entered into by the corporation through its president, testimony as to the contract and its terms was properly admitted, where there was testimony from which the authority of the president to act as agent of the corporation could be implied and tending to show a subsequent ratification of the contract by accepting benefits from it.

4. Evidence—Value of Lumber.—In an action for breach of a contract for lease and option by a sale of land to another, whereby plaintiff was denied the right to remove improvements, testimony as to the original bill of lumber used by plaintiff in constructing a house was admissible as a basis for estimating the value thereof as second-hand lumber in the knockdown.

5. Evidence—Breach of Contract.—In an action for breach of a contract for the lease and option of land by sale of the land to the government, which prohibited plaintiff from removing improvements, a letter from the government inspector directing plaintiff not to remove such improvements *held* properly admitted as a circumstance tending to show a breach of the contract.

6. Corporations—Instruction on Ratification.—In an action against a corporation for alleged breach of a contract, evidence

that the corporation accepted benefits under the contract was sufficient to authorize a court to instruct a jury upon the law of ratification.

7. VENUE—ACTION FOR BREACH OF CONTRACT.—An action for breach of a contract for the lease and option to buy land is transitory and not local, and was properly brought in the county of defendant's domicile, rather than in the county where the land is situated.

Appeal from Washington Circuit Court; J. S. *Maples,* Judge; affirmed.

*J. W. Grabiel* and *W. N. Ivie,* for appellant.

*Walker & Walker,* for appellee.

HUMPHREYS, J. Appellee brought suit against appellant in the circuit court of Washington County for $2,500 damages on account of the alleged breach of a contract for lease and option to appellee by appellant of certain lands in Franklin County, Arkansas, when it got ready to sell same, and, if appellee should not then desire to purchase said lands, that he should have the right to remove such improvements as he had made thereon.

Appellant filed an answer, denying the material allegations in the complaint.

The cause was submitted upon the pleadings, testimony introduced by the respective parties, and the instructions of the court, resulting in a verdict and consequent judgment in favor of appellee for $700, from which is this appeal.

According to the undisputed testimony, appellant is a domestic business corporation, and in 1919 owned 9,000 acres of timber land in Franklin County. It was engaged in the hardwood lumber business, railroad and mercantile business, the two latter being incidental to the manufacture of hardwoods for the market. Jay Fulbright was its president, and J. H. Phipps its vice president and manager. Jay Fulbright controlled a majority of the stock, and dominated the corporation. In the fall of 1919 Fulbright, acting for the corporation, but without any express authority under charter or specially delegated to him by the board of directors, entered into

a contract of lease and option to appellee of about one hundred acres of said land, with the privilege to appellee to remove his improvements off the land if he should not choose to buy same when appellant decided to sell its lands, or this particular land. The directors and officers of appellant knew of the contract, but never approved it in a formal way. The minutes of the meetings of the board are silent on the matter, and the directors and officers who testified in the case had no recollection of the matter ever having been reported to the board or acted upon by them. Appellee testified that he talked to some of the directors about it, but made no formal report to the board relative to the contract or its terms. He said that, in making the contract, he regarded and treated Fulbright as the corporation itself.

Pursuant to the agreement between Fulbright and appellee, he built a house upon the land, which cost $2,000, and built a hog-proof wire fence around same at an expense of $500. The improvements were completed in the spring of 1920, and appellee's son moved on the property to farm it and look after the hogs and herd of cattle, which appellee bought from Fulbright. At the expiration of two years appellee's son moved away, and the house was unoccupied most of the time prior to the purchase of the land, in 1924, by the United States Government, from appellant. The Government purchased said tract of over 9,000 acres from appellant for forest reserve purposes, at $2.75 per acre, and refused to allow appellee to remove his improvements. This sale was made after Jay Fulbright died, and after he was succeeded as president of appellant by his son, Jack Fulbright. When appellee heard of the sale to the Government, he consulted Jack Fulbright with reference to removing his improvements, and was informed that he would have to take the matter up with the United States Government. He did so, and was notified by the United States Government not to remove the improvements.

The original charter conferred authority upon it to purchase, lease and sell real estate. The charter, as

amended in 1913, authorized the purchase of real estate, but contained no provision authorizing it to lease or sell same.

Learned attorneys for the respective parties differ in their interpretation of the testimony relative to the agreement to pay rent for the land upon which the improvements were made. Appellants' attorneys interpret the evidence to mean that the agreement to pay rent was a separate contract, and wholly disconnected from and not growing out of the contract of lease and option made between Fulbright and appellee; whereas appellee's attorney interprets the evidence as meaning that the agreement was to pay $100 per year for the use of the land as a part of the lease and option contract. The testimony shows, without dispute, that the rent was paid directly to appellant corporation for two years, 1920 and 1921, during which time appellee occupied and used the house and land which he had fenced. Appellee testified, on page 37 of the transcript, that he paid rent in 1920 and 1921, in connection with his statement that his son moved out of the house after occupying it two years.

Mr. Jeter, who was in charge of appellant's mills, and who was interested in the corporation, testified, on page 50 of the transcript, relative to the lease and option contract made by Fulbright and appellee at Combs, as follows:

"Q. Mr. Jeter, was there anything said in that conversation as to how much land Mr. Phipps was to rent or use? A. Well, I do not know that there was any more than to use all there was in that country for grazing purposes; he had that privilege from the company. Q. Was there anything said in that conversation about Mr. Phipps paying rent? A. I do not remember as to that. Q. You do not remember as to that? A. No, that was settled, I think, in the office here; however, I understand that he did pay rent. Q. Do you know whether Mr. Phipps paid rent at the rate of $100 a year? A. That is my understanding that he did."

Appellant's first contention for a reversal of the judgment is that the court should have instructed a verdict in its favor, under the undisputed facts in the case. It requested a peremptory instruction, which the court refused, over its objection and exception. It argues that the contract was in excess of the charter powers, and *ultra vires,* because the amended charter of 1913 did not authorize the corporation to lease or sell its real estate. The amended charter authorized it to purchase and hold real estate in connection with its business. The charter, prior to being amended, authorized it to lease and sell its real estate. This provision was omitted from its amended charter. Although omitted from the charter, the power was inherent in the corporation to lease or sell its real estate which it bought in connection with its business; else how could it realize on its assets? Especially is this true of lumber concerns, which buy large tracts of timber land to obtain raw material for manufacturing the lumber. It would be indeed a strange doctrine that such corporations could not dispose of their cut-over lands or could not lease them for agricultural purposes, simply because express authority was not conferred in their charters.

We cannot agree with appellant's contention that the contract was *ultra vires.* It argues, however, that the president of the corporation had no right to make the contract without authority conferred by charter or by the board of directors. It is true that the general inherent power of a president of a corporation does not include the authority to make contracts for the corporation, but this cause was sent to the jury upon the theory that the president, Jay Fulbright, had authority to lease and option the lands on account of holding a majority of the stock and dominating the business affairs of the corporation. The issues submitted to the jury were whether Fulbright had *implied authority* to act for the corporation, by virtue of owning most of the stock and being permitted to dominate its affairs, and whether the corporation was bound under the contract

by accepting benefits under it. The testimony tended to show that the corporation was a one-man corporation, being controlled and dominated by its president, who was also the owner of most of the stock, and also tended to show that the corporation, through its officers and directors, accepted rents for the use of the land, and subsequently sold same to the United States without reserving the improvements for removal by appellee. The improvements were substantial and valuable. The inference may have been drawn by the jury that these improvements enhanced the value of the land and that appellant received benefits from them in the sale thereof. It is true that it does not affirmatively appear in the record that the Government and appellant took the improvements into consideration in agreeing upon the purchase price, yet the Government refused to allow the improvements to be removed, and appellant did not reserve them when it sold the land. In the state of the record the jury may have concluded that the agreement to pay rent of $100 a year was a part of the consideration for the lease and option contract. If so, then the corporation received $200 in rents on account of the lease and option. Certainly appellee would not have paid $200 for the purpose of grazing cattle and hogs on open or range land owned by the corporation, when he or any one else could have let his stock run at large on the land without paying anything for the privilege; but, to say the least of it, the issue was one for the jury.

Appellant contends for a reversal of the judgment because Phipps and Jeter were permitted to testify relative to the contract and terms thereof without first showing that Jay Fulbright had express authority to act for the corporation. The testimony of both was admissible, because testimony was introduced from which such authority might be implied, and because there was testimony tending to show a subsequent ratification of the contract by receiving benefits therefrom or thereunder.

Appellant also contends for a reversal of the judgment because appellee and his witness, Duncan, were

permitted to testify to a bill of lumber bought from T. J. Gillstrap Lumber Company and to identify and introduce the bill of lumber as an exhibit, which lumber was used in the construction of the house. This bill of lumber amounted to $557.21. It was admissible to introduce the original bill of lumber used in the house as a basis for estimating the value thereof as second-hand lumber in the knockdown.

Appellant also insists upon reversal of the judgment because appellee was permitted to testify relative to receiving a notice or letter from the Government inspector at Russellville in 1924, directing him not to remove the improvements. The basis of the suit was the refusal of appellant to allow appellee to remove the improvements, and appellee was told by appellant's president to take the matter up with the United State Government, to whom it had sold the land. This piece of evidence was a circumstance to show a breach of the contract, and was clearly admissible, the notice and letter purporting to come from a representative of the United States Government.

Appellant also contends for a reversal of the judgment because the court gave instruction No. 1. The objection urged to the instruction is that it assumed that Fulbright acted as agent for the corporation in making a contract of lease and option with appellee. It does not assume agency. It submitted that issue to the jury, and properly so, for testimony was introduced in the case tending to show that Fulbright owned and dominated the corporation, in which event the jury might have drawn a reasonable inference that he was acting for the corporation.

Appellant also contends for a reversal of the judgment because the court instructed the jury upon the law of ratification and the refusal to give its requested instructions because they omitted any reference to the law of ratification. The argument is made that no evidence was introduced tending to show a ratification of the contract by the corporation. We think there was.

The testimony tended to show that the corporation accepted benefits under the contract. Appellant pleaded the statute of frauds as a defense to the action, and contends for a reversal of the judgment because the contract had relation to the lease and sale of lands, and, to be binding, should have been written. The contract was partially performed, which removed it from the operation of the statute of frauds.

Appellant also contends for a reversal of the judgment upon the ground that the circuit court of Washington County had no jurisdiction to try the cause of action. It is argued that the action is local, and should have been brought where the land is situated. This is not a suit for specific performance of the contract, but for a breach of contract for lease and option to buy, and is transitory and not local. The Arkansas domicile of the corporation is in Fayetteville, hence the suit was properly brought in Washington County, of which Fayetteville is the county seat.

There being no reversible error in the record, the judgment is affirmed.